

# IN THE
# TENTH COURT OF APPEALS

## No. 10-16-00105-CV

## IN THE INTEREST OF J.D. AND S.D., CHILDREN

**From the 74th District Court
McLennan County, Texas
Trial Court No. 2015-50-3**

## MEMORANDUM OPINION

Raising one issue, Appellant A.C. appeals the trial court's termination of her parental rights to her children J.D. and S.D. under subsections E and O after a bench trial. We will affirm.

Appellant's issue asserts that the trial court erred in not granting a 180-day extension of the statutory dismissal deadline under Family Code subsection 263.401(b), which allows the trial court to extend the dismissal deadline if the court finds "that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the

department as temporary managing conservator is in the best interest of the child." TEX. FAM. CODE ANN. § 263.401(b) (West Supp. 2015).

We review a trial court's denial of an extension request under section 263.401(b) for an abuse of discretion. *In re D.M.*, 244 S.W.3d 397, 416 (Tex. App.—Waco 2007, no pet.) (op. on reh'g); *see also In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied); *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008), *pet. denied per curiam*, 260 S.W.3d 462 (Tex. 2008). "The focus is on the needs of the child, whether extraordinary circumstances necessitate the child remaining in the temporary custody of the Department, and whether continuing such is in the best interest of the child." *A.J.M.*, 375 S.W.3d at 604.

> To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.

> An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.

*D.W.*, 249 S.W.3d at 647 (citations omitted).

After a series of investigations and Family Based Safety Services (FBSS) cases involving Appellant and her two children, the Department received a referral alleging Appellant's neglectful supervision of her children. The Department had always had

concerns about Appellant's mental health, but no abuse or neglect could be found to warrant removal. The latest investigation, however, revealed that Appellant had bit J.D., her oldest child, on the face as a form of discipline. The children were therefore removed.

Appellant met with CPS (the Department) on January 28, 2015, and a service plan was developed. The service plan required Appellant to have a psychiatric and a psychological evaluation. During the pendency of the case, Appellant was not permitted visitation with the children until a doctor showed that she was mentally stable.

The final hearing began on January 5, 2016, with Appellant appearing in person and with her attorney. Appellant's counsel re-urged an oral motion for extension that had been made at the previous hearing, stating "we've kind of had some interim time to make some progress here and you said we could reassert that motion to hear." The attorney ad litem suggested that the hearing proceed and that the trial court defer a ruling on the extension motion until the end of testimony. The trial court stated its intention to address the extension motion at the end of the day after hearing testimony. We therefore will review the testimony that the trial court heard and based its ruling on.

Adrienne Jones, the CPS caseworker, testified that since September, the children had been in a foster home as a prospective adoptive placement. The current investigation had revealed a bite mark on J.D.'s face, which he reported had been caused by Appellant as a form of punishment. Concerns about Appellant's emotional and mental instability and the injury to J.D. led to the removal of the children. Appellant later admitted to biting

J.D. as a form of punishment. Appellant had been saying things such as she was the "Lamb of God" and that "they were going to chop off her head and drain her blood." J.D. had begun to believe and mimic Appellant's statements and beliefs, saying that "demons were after him, that they were attached to him, that he could hear voices." Appellant was having hallucinations and was subsequently diagnosed as schizophrenic. Through therapy and the foster placement, J.D. was "now able to basically be normal. He's not stating that he's hearing voices or talking about demons. He's basically - - all that information that he was led to believe that he thought was real has now subsided." J.D. was age nine at the time of trial.

Jones said that in February 2015, Appellant was given a service plan that required her to undergo a psychiatric evaluation. Jones and another CPS worker took Appellant to Austin for the evaluation, which resulted in a diagnosis of schizophrenia. Appellant was also required to undergo a psychological evaluation with Dr. Shinder. Appellant went for that examination, but the doctor was unable to score it because Appellant "spent three days talking to someone that wasn't there, asking them for answers to the questions; and he [Dr. Shinder] said it was all nonsense and he was not able to score it."

The service plan precluded Appellant's visitation with the children until a therapist recommended it for J.D. and a doctor was satisfied that Appellant was mentally stable. Appellant was present in court when this was ordered. Jones had also met with Appellant and told her that she needed to get on medication and go to MHMR because

she would not be allowed to see her children until she was stable. Appellant was never able to show the trial court or the Department that she had become mentally stable and that she was on medication long enough to become stable. Appellant told Jones that she was stable, but after multiple requests, Appellant never provided documentation from a therapist or a medical doctor to this effect.

Appellant also had not been able to show the Department that she could keep a stable living situation. She had been terminated from her job at a restaurant, and she had not worked since March 2015. She claimed that she was getting disability, but she never provided documentation of that. Appellant had been basically homeless for about nine months during the pendency of the case, and she had been in and out of a number of facilities during that time period. A couple of weeks before the hearing, Appellant reported that she had gotten an apartment, but she never provided an address.

Jones said that the children were flourishing in their foster placement, and she believed that it was in the best interest of the children to terminate Appellant's parental rights and work towards adoption with the placement family.

On cross-examination, Jones agreed that Appellant had been working with MHMR, but she disagreed that Appellant had completed that part of the service plan. Asked if MHMR had put Appellant on different medications, Jones replied that she had not been provided with any lists or medical documentation, although she had requested this from both MHMR and Appellant multiple times. Asked if Appellant had "started to

make a little more progress here in the last couple of months than how it started off," Jones replied that she still had not received documentation from a medical professional showing that Appellant was stable, and she still had no documentation showing that Appellant even had a place to live. Jones said that Appellant had completed a parenting class.

Jones said that Appellant had not intentionally dodged her, that she had generally stayed in contact, and that she had been available most of the time when Jones called her, "unless her phone gets cut off." In response to whether she thought that Appellant could complete more of her services if she got her medicines adjusted and had more time, Jones said that she thought it would be hard to say because Appellant not only needed to be stable, she also needed long-term stability because she had severe mental health issues that she had been projecting onto J.D. Jones was resistant to giving Appellant more time because she had been diagnosed with schizophrenia in April and had still not provided documentation that she was on medication. Appellant had left a voicemail for Jones the day before the final hearing, telling Jones that she had proof from her doctor and acknowledging that she knew it was "at the last minute."

Aside from the documentation requirement, Jones had not seen any kind of manifestation as evidence that Appellant was on medication. Jones said that, when visiting Appellant on several occasions between June and August of 2015, Appellant was still delusional and was talking to people who were not there. And until making the

recent claim of having gotten an apartment, Appellant had been bouncing back and forth between respite centers, homelessness, and psychiatric hospitals. Notwithstanding the medication issue, Jones had concerns that Appellant had not shown that she could maintain a place to live for two small children or maintain a job.

The trial court recessed the final hearing until January 21, 2016 without announcing a ruling on the motion for extension. When the final hearing reconvened, Jones testified that Appellant had claimed to be on medication since September 2015, but she never provided documentation of it to the Department. Appellant also told Jones that she had been given a journal to write down what the voices she heard were telling her, and Jones reiterated her previous testimony that, aside from no documentation, Appellant's behavior still did not manifestly reflect stability. Jones also repeated Appellant's behaviors that were a concern. During the recess from the previous hearing, Appellant did provide Jones an apartment address, but Jones did not consider this last-minute development sufficient to satisfy her concern about Appellant's ability to provide a safe and stable home because it did not overcome Appellant's pattern of instability over the past year.

Jones testified that, just before the final hearing reconvened, Appellant's counsel showed her a letter from Dr. Houston at MHMR that was dated December 11, 2015 and that indicated that Appellant was on medication for schizophrenia and depression. The letter expressed the opinion that Appellant was improving and had reportedly stopped

her illegal drug use, with Jones noting that the Department had no prior knowledge that Appellant had been using illegal drugs. Jones agreed that the letter reflected progress, but at a very late date in the case, and she added that Appellant's progress still did not demonstrate stability. Also, Dr. Houston's letter did not recommend a return of Appellant's children.

Appellant's counsel then showed Jones a lease agreement that had been signed on December 11, 2015, along with a January 12, 2016 letter from SSI reflecting Appellant's income. This was the first time that Jones had seen either document. The fact that Appellant had waited so long to provide the documentation and had even stated that she knew she was "until the last minute" concerned Jones, who responded to Appellant that "these are your children that you have been needing to be stable for for over a year." Jones was also concerned about the revelation of Appellant's illegal drug use, especially in a case of a schizophrenic using methamphetamine. An additional concern was that Appellant had withheld her illegal drug use from the Department throughout the case.

Regarding Appellant's request for a six-month extension, Jones said that Appellant was not even at the point where she was not hearing voices or otherwise stable, and there had been no evidence of stability for nearly a year. Jones thought that, at this point in time, Appellant's issue was not whether she could parent her kids, but whether she could actually just manage herself. Jones also said that Appellant's drug abuse was now compounding the problem because she would need treatment for that issue as well.

Therefore, the Department's position was that even an additional six months was not enough time for Appellant to show that she could maintain her own life and care for her children.

K.S.O., Appellant's mother, believed that Appellant was improving. K.S.O. said she was willing to help Appellant in her normal everyday affairs and that Appellant had gotten an apartment and social-security benefits on her own. K.S.O. believed that Appellant was a good mother and knew that she could take care of her children. K.S.O. testified that Appellant had taken proper care of her children before removal, "Except for her having to be without a place to live."

K.S.O. said she had not become aware of Appellant's mental-health issues until about two years ago. She was unaware that for four years the Department had had concerns about Appellant's stability. Regarding Appellant's illegal drug use, K.S.O. testified that "that was the first time I had heard about it."

Appellant testified that she had started seeing Dr. Houston in May 2015 and that he put her on medications. The medications helped her focus on what was in front of her, and she could comprehend better. Appellant testified that she had last used methamphetamine on the day she tested for Dr. Houston, which had been about a month ago. She believed that, under Dr. Houston's care, she would be able to complete her services. She also believed that, if she was given an extension, she could show some stability and prove to CPS that she was capable of taking care of her children.

Appellant testified that she had only used methamphetamine three times in her life and that she did not feel that she had a drug problem. She understood that she should have given the caseworker the needed documentation, but she said, "I verbalize everything that I do." She did not understand why the caseworker needed documentation "because my word is reliable enough because I don't have to lie to her. …" Appellant testified that she was required to keep a journal to write down what she hears, but she did not have a journal because, as she said, "I deal with it different. …" Appellant believed that "it's more than schizophrenia I have, that it's not a mental disability. It could be telepathy." She further believed that she is "very well grounded and that you don't realize it."

After the close of evidence and the argument of counsel, the trial court ruled that it did not find the existence of extraordinary circumstances to necessitate the children remaining in the temporary conservatorship of the department and denied the motion for extension. The trial court also found by clear and convincing evidence that Appellant had failed to comply with the service plan, that Appellant had engaged in conduct that had endangered the physical health and emotional well-being of the children, and that it was in the best interest of the children to terminate Appellant's parental rights.

Based on the record before the trial court, we cannot say that it abused its discretion in denying Appellant's motion for a 180-day extension of the statutory dismissal deadline. *See In re K.P.,* No. 02-09-00028-CV, 2009 WL 2462564, at *4 (Tex.

App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.) ("when a parent, through his or her own choices, fails to comply with a service plan and then at the time of the termination trial requests a continuance or an extension of the statutory dismissal deadline in order to complete the plan, the trial court does not abuse its discretion by denying the continuance or extension").

We overrule Appellant's sole issue and affirm the trial court's termination order.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed August 3, 2016
[CV06]

